

EXHIBIT

A

I3C 006922

# STATE OF NORTH CAROLINA

_____Wake_____ COUNTY

COPY

*File No.*

In the General Court of Justice
☐ District   ☒ Superior Court Division

| | |
|---|---|
| *Plaintiff(s) Name*<br>MARKETEL MEDIA, INC. and SAMUEL T. HASSELL,<br><br>*Address*<br><br>*City, State, Zip* | **CIVIL SUMMONS**<br>☐ **Alias and Pluries Summons**<br><br>G.S. 1A-1, Rules 3, 4 |
| **VERSUS** | *Date Original Summons Issued* |
| *Name Of Defendant(s)*<br>MEDIAPOTAMUS, INC. and KELLY JENKINS ORTIZ, | *Date(s) Subsequent Summons(es) Issued* |

**To Each Of The Defendant(s) Named Below:**

| | |
|---|---|
| *Name & Address of Defendant 1*<br>Mediapotamus, Inc.<br>33175 Temecula Parkway, Suite A203<br>Temecula, CA  92592 | *Name & Address of Defendant 2*<br>Kelly Jenkins Ortiz<br>24087 Semillon Lane<br>Murrieta, CA  92562 |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after
    you have been served.  You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's
    last known address; and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the Complaint, the Plaintiff will apply to the Court for the relief demanded in the Complaint.

| | |
|---|---|
| *Name and Address of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>William S. Cherry, III, NCSB # 33860<br>MANNING FULTON & SKINNER, P.A.<br>3605 Glenwood Avenue<br>P.O. Box 20389<br>Raleigh, North Carolina  27619-0389<br>Telephone: 919-787-8880;  Facsimile: 919-325-4604 | *Date Issued*   MAY 15 2013   *Time* 3   ☐ AM ☒ PM<br>*Signature*<br><br>☒ *Deputy CSC*   ☐ *Assistant CSC*   ☐ *Clerk of Superior Court* |

| | |
|---|---|
| ☐ **ENDORSEMENT (ASSESS FEE)**<br><br>This Summons was originally issued on the date<br>indicated above and returned not served.  At the<br>request of the plaintiff, the time within which this<br>Summons must be served is extended sixty (60)<br>days. | *Date of Endorsement*   *Time*   ☐ AM ☐ PM<br>*Signature*<br><br>☐ *Deputy CSC*   ☐ *Assistant CSC*   ☐ *Clerk of Superior Court* |

NOTE TO PARTIES:  *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is*
*$15,000 or less are heard by an arbitrator before a trial.  The parties will be notified if this case is assigned for*
*mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

753391.25576-L43478

13 CV 006922

# STATE OF NORTH CAROLINA

FILED

Wake County

2013 MAY 15 PM 3:11

WAKE COUNTY, C.S.C.

BY _____

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| Name And Address Of Plaintiff 1<br><br>Marketel Media, Inc. | |

## GENERAL
### CIVIL ACTION COVER SHEET
☒ INITIAL FILING ☐ SUBSEQUENT FILING

Rule 5(b), Rules of Practice For Superior and District Courts

Name And Address Of Plaintiff 2

Samuel T. Hassell

Name And Address Of Attorney Or Party, If Not Represented (complete for initial appearance or change of address)

William S. Cherry, III
P. O. Box 20389
Raleigh, NC 27619-0389

**VERSUS**

| Telephone No. | Cell Telephone No. |
|---|---|
| 919-787-8880 | |

Name Of Defendant 1

Mediapotamus, Inc.

| NC Attorney Bar No. | Attorney E-Mail Address |
|---|---|
| 33860 | cherry@manningfulton.com |

☒ Initial Appearance in Case ☐ Change of Address

Name Of Firm

Manning Fulton & Skinner, P.A.

Summons Submitted ☒ Yes ☐ No

Name Of Defendant 2

Kelly Jenkins Ortiz

| FAX No. |
|---|
| 919-325-4604 |

Counsel for
☒ All Plaintiffs ☐ All Defendants ☐ Only (List party(ies) represented)

Summons Submitted ☐ Yes ☐ No

☐ Jury Demanded In Pleading
☐ Complex Litigation

☐ Amount in controversy does not exceed $15,000
☐ Stipulate to arbitration

## TYPE OF PLEADING

(check all that apply)
☐ Amend (AMND) Assess Motion Fee
☐ Amended Answer/Reply (AMND-Response) Assess Motion Fee
☐ Amended Complaint (AMND) Assess Motion Fee
☐ Answer/Reply (ANSW-Response)
☐ Change Venue (CHVN) Assess Motion Fee
☒ Complaint (COMP)
☐ Confession Of Judgment (CNFJ)
☐ Consent Order (CONS)
☐ Consolidate (CNSL) Assess Motions Fee
☐ Contempt (CNTP) Assess Motions Fee
☐ Continue (CNTN) Assess Motions Fee
☐ Compel (CMPL) Assess Motions Fee
☐ Counterclaim vs. (CTCL) Assess Court Costs
☐ Crossclaim (List On Back) (CRSS) Assess Court Costs
☐ Dismiss (DISM) Assess Court Costs
☐ Exempt/Waive Mediation (EXMD) Assess Motions Fee
☐ Extend Status Of Limitations, Rule 9 (ESOL) Assess Motions Fee
☐ Extend Time For Complaint (EXCO) Assess Motions Fee

(check all that apply)
☐ Failure To Join Necessary Party (FJNP) Assess Motions Fee
☐ Failure To State A Claim (FASC)
☐ Improper Venue/Division (IMVN) Assess Motions Fee
☐ Intervene (INTR) Assess Motions Fee
☐ Interplead (OTHR) Assess Motions Fee
☐ Lack Of Jurisdiction (Person) (LJPN) Assess Motions Fee
☐ Lack Of Jurisdiction (Subject Matter) (LJSM) Assess Motions Fee
☐ Rule 12 Motion In Lieu of Answer (MDLA) Assess Motions Fee
☐ Sanctions (SANC) Assess Motions Fee
☐ Set Aside (OTHR) Assess Motions Fee
☐ Show Cause (OTHR) Assess Motions Fee
☐ Transfer (TRFR) Assess Motions Fee
☐ Third Party Complaint (List Third Party Defendants on Back) (TPCL)
☐ Vacate/Modify Judgment (VCMD) Assess Motions Fee
☐ Withdraw as Counsel (WDCN) Assess Motions Fee
☐ Other (specify and list each separately)

NOTE: See Side Two for a list of motions not subject to the motions fee.

## CLAIMS FOR RELIEF

☐ Administrative Appeal (ADMA)
☐ Appointment Of Receiver (APRC)
☐ Attachment/Garnishment (ATTC)
☐ Claim And Delivery (CLMD)
☐ Collection On Account (ACCT)
☐ Condemnation (CNDM)
☐ Contract (CNTR)
☐ Discovery Scheduling Order (DSCH)

☐ Injunction (INJU)
☐ Medical Malpractice (MDML)
☐ Minor Settlement (MSTL)
☐ Money Owed (MNYO)
☐ Negligence - Motor Vehicle (MVNG)
☒ Negligence - Other (NEGO)
☐ Motor Vehicle Lien G.S. 44A (MVLN)

☐ Limited Driving Privilege - Out-Of-State Convictions (PLDP)
☐ Possession Of Personal Property (POPP)
☐ Product Liability (PROD)
☐ Real Property (RLPR)
☐ Specific Performance (SPPR)
☒ Other (specify and list separately)
Declaratory Judgment; Defamation

| Date | Signature Of Attorney/Party |
|---|---|
| May 15, 2013 | |

NOTE: All filings in civil actions shall include as the first page of the filing a cover sheet summarizing the critical elements of the filing in a format prescribed by the Administrative Office of the Courts, and the Clerk of Superior Court shall require a party to refile a filing which does not include the required cover sheet. For subsequent filings in civil actions, the filing party must either include a General Civil (AOC-CV-751), Motions (AOC-CV-752) or Court Action (AOC-CV-753) cover sheet.
(Over)

**DO NOT CHARGE MOTIONS FEE**
Assess costs (COST) Including Attorney's Fees (ATTY)
Implementation Of Wage Withholding In Non-IV-D Cases (OTHR)
Modification Of Child Support In IV-D Actions (MSUP)
Notice Of Dismissal With Or Without Prejudice (VOLD)
Petition To Sue As Indigent (OTHR)

**DO NOT CHARGE MOTIONS FEE. FEES IN GS 7A-308 APPLY**
Assert Right Of Access (ARAS)
Subtitution Of Trustee (Judicial Forclosure) (RSOT)
Supplemental Procedures (SUPR)

**DO NOT CHARGE MOTIONS FEE. OTHER FEES APPLY**
Motion Ffor Out-of-State Attrorney To Appear In NC Courts In A Civil Or Criminal Matter (Out Of State Attorney/Pro Hac Vice Fee)
Request For Subpoena By Out-Of-State Attorney

| No. | ☐ **Additional Plaintiff(s)** |
|---|---|
| | |
| | |
| | |
| | |
| | |

| No. | ☐ **Additional Defendant(s)**    ☐ **Third Party Defendant(s)** | Summons Submitted |
|---|---|---|
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |
| | | ☐ Yes ☐ No |

*Plaintiff(s) Against Whom Counterclaim Asserted*

*Defendant(s) Against Whom Crossclaim Asserted*

AOC-CV-751, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

13CV006922



STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
                                    SUPERIOR COURT DIVISION
COUNTY OF WAKE                            13-CVS-____

MARKETEL MEDIA, INC. and
SAMUEL T. HASSELL,

        Plaintiffs,

        v.                        **VERIFIED COMPLAINT**

MEDIAPOTAMUS, INC. and KELLY
JENKINS ORTIZ,

        Defendants.

Plaintiffs Marketel Media, Inc. and Samuel T. Hassell [collectively "Plaintiffs"], complaining of Defendants Mediapotamus, Inc. and Kelly Jenkins Ortiz [collectively "Defendants"] allege as follows:

<u>PARTIES AND JURISDICTION</u>

    1.    Marketel Media, Inc. ["Marketel"] is a North Carolina corporation with offices and a principal place of business in Wake County, North Carolina.

    2.    Samuel T. Hassell ["Hassell"] is a citizen and resident of Wake County, North Carolina, the sole director of Marketel and owner of 51% of the shares of stock of Marketel.

    3.    Upon information and belief, Mediapotamus, Inc. ["Mediapotamus"] is a California corporation and, upon information and belief, at relevant times has conducted its business nationwide including, but not necessarily limited to, business with Marketel in North Carolina.

    4.    Upon information and belief, Kelly Jenkins Ortiz ["Ortiz"] is sole shareholder and owner of Mediapotamus and owns 49% of the shares of Marketel stock.

1

5.    Based on the facts alleged herein, the court has jurisdiction over the parties and the subject matter of this action pursuant to applicable North Carolina law, including but not limited to N.C. Gen. Stat. 1-75.4(1), N.C. Gen. Stat. 1-75.4(5) and N.C. Gen. Stat. 1-75.4(6), N.C. Gen. Stat. § 1-253 *et seq.*

6.    The Court has jurisdiction over the parties and subject matter in this action and venue is proper in this Court.

<u>THE MARKETEL COMPENSATION MODEL</u>

7.    Marketel was incorporated as a North Carolina corporation in July 2011 by Hassell.

8.    Marketel is engaged in the business of providing advertising, planning, placement, buying and related negotiations, activities and services primarily using radio and dedicated email blasts throughout the United States.

9.    Since its inception in 2011, Marketel has entered into written or oral agreements with other entities working in the radio and dedicated email advertising niche industry in joint venture type arrangements to conduct the desired advertising.  Marketel commonly refers to these entities as "Associate Entities."

10.    Each Associate Entity works with its network of contacts and potential clients in need of radio and dedicated email advertising to obtain advertising services work for Marketel.

11.    Marketel provides resources and brand identity for the Associate Entity with respect to Marketel's areas of expertise.

12.    Hassell, individually, provides consulting and strategic advice to the Associate Entities to assist in their procurement of advertising business and frequently permits new Associate Entities to play an active role in managing, negotiating and consulting with clients that

2

Hassell and/or his Associate Entities (see Paragraph 20 below) procure as clients for Marketel. Hassell's goal is to provide new Associate Entities with the opportunity to quickly gain experience in the niche market in order to increase the ability of those Associate Entities to procure new clients for Marketel which in turn make the Associate Entities more profitable pursuant to the compensation plan described below.

13.     Once an Associate Entity identifies prospective clients in need of the services provided by Marketel, those prospective clients become clients of Marketel ["Marketel Clients"] by entering into agreements with Marketel for the particular advertising services needed.

14.     Per their agreements, the Marketel Clients pay Marketel a sum of money ["Media Buy Compensation"] (a) to buy media advertising, usually radio, email blast and related advertising services, and (b) to compensate Marketel for the services rendered.

15.     The portion of the Media Buy Compensation in Paragraph 14(b) above which is paid as compensation to Marketel for services rendered is used (a) for payment of Marketel's overhead and operating expenses associated with the services provided and (b) for payment of compensation for the procuring Associate Entities.

16.     More specifically, an agreed upon portion of the Media Buy Compensation described in Paragraphs 14 and 15 above is paid directly to the Associate Entities which procured the client for Marketel ["Associate Payment"].

17.     Following payment of the Associate Payment, the remaining portion of the Media Buy Compensation is used for payment of Marketel's overhead and expenses for each Marketel Client.

18.     In the event that Marketel retains money from the Media Buy Compensation following payment of the Associate Payment and Marketel expenses and overhead, the sum that

3

remains is, at the discretion of Hassell, divided among other Associate Entities and/or individuals associated with Marketel that assisted Marketel in the servicing of the particular client.

19.     In addition, the procuring Associate Entities, in their sole discretion, may choose to use a portion of the Associate Payment they receive from Marketel to compensate other persons, entities or Associate Entities that assisted with the services and work for particular clients.

20.     Hassell is (and has been) the sole owner and operator of multiple entities that work as Associate Entities to procure advertising clients for Marketel. Each of the Associate Entities owned and operated by Hassell follow the above described compensation model following their procurement of advertising services work for Marketel and routinely compensate other Associate Entities that assist in serving the clients procured for Marketel by Hassell's Associate Entities.

## MEDIAPOTAMUS AND ORTIZ

21.     In addition to the Associate Entities owned and operated by Hassell, Marketel also enters into agreements with Associate Entities owned and operated by third persons.

22.     One of the Associate Entities with which Marketel entered into a oral agreement consistent with the compensation terms set forth herein was Mediapotamus, solely owned and operated by Ortiz.

23.     Separate and distinct from the agreement between Mediapotamus and Marketel, Ortiz, individually, also became a shareholder of Marketel.

24.     Consistent with his general practice following an agreement between Marketel and a new Associate Entity, Hassell permitted Mediapotamus, and therefore Ortiz, to take an active day to day role in the management and consulting services for AMAC, Inc. (the

4

Association of Mature American Citizens), a client procured for Marketel by In Hoc Signo, Inc., an Associate Entity owned and operated by Hassell, as well as other clients procured by Hassell's Associate Entities.

25. In addition, and pursuant to its agreement with Marketel, Mediapotamus, like all other Associate Entities, agreed to and was expected to work to obtain new advertising and marketing work for Marketel, in turn for which it would be compensated as set forth and described above.

26. Mediapotamus performed management services, consulting services, radio planning and associated digital and email blast buying services for AMAC, Inc. and other Marketel Clients procured by Hassell's Associate Entities for which Mediapotamus was compensated in the discretion of Hassell as the procuring Associate Entities.

27. Mediapotamus was also paid a share of Marketel's income directly resulting from clients procured by other Associate Entities in the discretion of Hassell based on the work Mediapotamus/Ortiz performed for the benefit of those clients.

28. Mediapotamus also managed and maintained the payroll, finances, and accounting books and records for Marketel.

29. Mediapotamus never obtained or procured any clients for Marketel and thus was never directly compensated as a procuring Associate Entity as described above.

30. Upon information and belief, Mediapotamus had other clients for which it performed advertising and advertising related work similar to the work performed by Marketel, but it never delivered those clients to Marketel and Marketel never received any compensation, profits, income or other benefits of any kind from those clients.

5

31.    Despite the agreement between Mediapotamus and Marketel as set forth herein, which in all respects was consistent with the Marketel compensation plan described in Paragraphs 13 to 20 above, disputes and controversies arose between Mediapotamus and Marketel relating to whether or not Mediapotamus and/or Ortiz were properly and completely compensated by Marketel.

32.    Marketel and Hassell contend that Mediapotamus and/or Ortiz were compensated in accordance with the agreed compensation plan and that, in fact, Ortiz was overcompensated by Marketel, Hassell and the Associate Entities owned by Hassell because the work actually performed by Mediapotamus and/or Ortiz was of such poor quality, including but not necessarily limited to their negligent management of the finances, books and records of Marketel as described below (See Paragraphs 63 to 67 below).

33.    Marketel and Hassell also contend that since Mediapotamus never procured any clients for Marketel neither it, nor Ortiz, were ever entitled to direct compensation as a procuring Associate Entity as described in Paragraphs 14 through 16 above.

## INTELIMARC, INC.

34.    Separate and distinct from his direct work with Marketel and his work with Marketel through his Associate Entities, in December 2011, Hassell formed an entity named Intelimarc, Inc. ["Intelimarc"].

35.    Intelimarc was formed for the sole purpose of negotiating and managing the advertising and marketing (as well as related advertising and marketing consulting services) for the Newt Gingrich-supporting Super PAC "Winning Our Future" ["Winning Our Future"].

36.    Pursuant to its agreement with Winning Our Future, Intelimarc was to perform advertising, marketing and strategy advice services which included radio advertising buys, email

6

blasts, search engine marketing, search engine optimization and Facebook advertising. Intelimarc also played a key role in strategy and deployment of "Winning Our Future" mobile messaging, robocalls, polling, content development, earned media (interviews) and donor development.

37.     Since Marketel had no experience in performing search engine marketing, search engine optimization or Facebook advertising but had substantial experience in radio advertising and radio advertising related services as well as email blast advertising, Intelimarc contracted out to Marketel only the radio and email blast advertising for Winning Our Future.

38.     What is more, Marketel did not have the time, capacity or resources to perform the search engine marketing, search engine optimization or the Facebook advertising and marketing for Winning Our Future.

39.     Solely for purposes of Intelimarc's radio advertising and email blast advertising, which is the work regularly performed by Marketel and for which Marketel had the capacity to perform, Intelimarc was treated the same as any other Associate Entity that procured advertising and marketing work for Marketel.

40.     Marketel was compensated for the work it performed for Winning Our Future just as it was compensated for any other client procured by an Associate Entity.

41.     Mediapotamus and/or Ortiz were compensated in accordance with the compensation plan and general practice of Marketel as set forth herein, based on the work actually performed by Mediapotamus and/or Ortiz for Winning Our Future.

42.     At all relevant times, Ortiz was informed about and aware of the working relationship between Intelimarc and Marketel as described herein and consented to the arrangement.

## ORTIZ §55-7-42 DEMAND FOR DERIVATIVE ACTION

43.     On February 14, 2013, Ortiz as minority shareholder of Marketel made a demand on Marketel pursuant to N.C. Gen. Stat. §55-7-42 to take action for various alleged wrongdoing by Hassell. A true and accurate copy of the demand letter is attached hereto as Exhibit A.

44.     Pursuant to N.C. Gen. Stat. §55-7-42, Marketel had 90 days from the date of the demand letter to review and inquire into Ortiz's various allegations of wrongdoing by Hassell.

45.     Ortiz did not set forth any reasons in her demand letter or any subsequent correspondence that would indicate that any irreparable harm would occur to her during the course of the 90 days in which Marketel was permitted to review the allegations.

46.     Following review, Marketel has determined that no wrongdoing has occurred and, within the 90 days since receiving Ortiz's demand letter has filed this declaratory judgment action to obtain a court order that no wrongdoing has occurred (along with relief for the other claims set forth herein).

### FIRST CLAIM FOR RELIEF
### Declaratory Judgment (Compensation Allocation and Distribution)

47.     The allegations of paragraphs 1 through 46 are re-alleged and incorporated herein by reference.

48.     As alleged herein, Mediapotamus and Ortiz were properly and fairly compensated in accordance with the compensation plan described herein based on (i) the services and/or work they actually performed for the Marketel Clients procured by the Associate Entities and (ii) the fact that Mediapotamus never procured any Marketel Clients.

49.     In fact, as set forth above, Marketel and Hassell contend that Mediapotamus and/or Ortiz were overcompensated for the work actually performed due to the poor quality and negligent nature of work actually performed as set forth below.

8

50.     An actual and existing controversy has arisen between Plaintiffs and Defendants regarding whether Mediapotamus and/or Ortiz have been properly compensated by Marketel.

51.     Pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to judgment declaring that Mediapotamus and/or Ortiz have been properly compensated by Marketel.

## SECOND CLAIM FOR RELIEF
### Declaratory Judgment (No Diversion of Corporate Opportunity)

52.     The allegations in paragraphs 1 through 52 above are re-alleged and incorporated herein by reference.

53.     As set forth herein, Marketel and Hassell did not divert any corporate opportunities of Marketel to Intelimarc or any other person or entity.

54.     Hassell and Intelimarc provided Marketel with all work that it regularly and commonly performed and which it had the time, capacity and resources to perform.

55.     An actual and existing controversy has arisen between Plaintiffs and Defendants regarding whether Hassell diverted corporate opportunities of Marketel.

56.     Pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to judgment declaring that Hassell did not divert corporate opportunities of Marketel.

## THIRD CLAIM FOR RELIEF
### Declaratory Judgment (Ownership of Shares in Marketel)

57.     The allegations in paragraphs 1 through 56 above are re-alleged and incorporated herein by reference.

58.     As alleged herein, Ortiz, individually, became a shareholder of Marketel.

59.     As agreed between Hassell and Ortiz, Hassell is a 51% shareholder of Marketel and Ortiz is a 49% shareholder of Marketel.

9

60.     An actual and existing controversy has arisen between Plaintiffs and Ortiz regarding the percentage ownership of shares of each in Marketel.

61.     Pursuant to N.C. Gen. Stat. § 1-253 *et seq.*, Plaintiffs are entitled to judgment declaring that Hassell is a 51% shareholder in Marketel and Ortiz is a 49% shareholder in Marketel.

### FOURTH CLAIM FOR RELIEF
#### Negligent Maintenance of Finances, Books and Records (Ortiz/Mediapotamus)

62.     The allegations in paragraphs 1 through 61 above are re-alleged and incorporated herein by reference.

63.     Mediapotamus and Ortiz were responsible for, and accepted responsibility for, managing the finances and maintaining the books and records of Marketel, including but not necessarily limited to, maintaining the actual physical and electronic financial and accounting files, maintaining QuickBooks, maintaining and managing customer billing, maintaining and managing vendor billing, maintaining and processing payroll for Ashley Long (Marketel's only employee at relevant times).

64.     Part of the compensation paid to Mediapotamus and/or Ortiz by Marketel, Hassell's Associate Entities and other Associate Entities was compensation for Mediapotamus' and/or Ortiz's work in managing the finances and maintaining the books and records of Marketel as described above.

65.     Mediapotamus and Ortiz had a duty to exercise reasonable care and accurately organize, compile, record and maintain the finances, books and records of Marketel (as described above).

10

66.     Mediapotamus and Ortiz breached their duty to exercise ordinary and reasonable care and accurately organize, compile, record and maintain the finances, books and records of Marketel by doing (or failing to do), among other things, the following:

a)  Physical files were not complete or organized making it difficult for Marketel to determine whether customer billing and vendor billing has been correct;

b)  Maintaining the customer and vendor billing records in an unorganized and incomplete manner;

c)  Improper customer billing and mistakes in the customer billing;

d)  Improper vendor billing and mistakes in the vendor billing;

e)  Failing to provide vendors with required IRS Form W-9s with invoices;

f)  Upon information and belief, making unauthorized payroll to Ashley Long;

g)  Making unauthorized bonus payments to Ashley Long;

h)  Failing to identify multiple checks made payable, with Hassell's forged signature, to Ashley Long, which forged signature upon information and belief was drawn by Ashley Long;

i)  Upon information and belief, making changes to year end 2011 accounting database after given to CPA for tax preparation.

67.     As a direct and proximate result of the negligence of Mediapotamus and Ortiz, Marketel has suffered substantial monetary damage and has incurred expenses to remedy problems caused by Mediapotamus' and/or Ortiz's negligence, the amount of said monetary damage and expenses to be demonstrated at trial, but in any event, exceeding Ten Thousand Dollars ($10,000.00).

## FIFTH CLAIM FOR RELIEF
### Defamation and Slander (Ortiz)

68.     The allegations in paragraphs 1 through 67 above are re-alleged and incorporated

herein by reference.

69.     Upon information and belief, Ortiz wrote and published, and/or caused to be

written or published, a libelous statement about Hassell impeaching him in his business, trade

and profession on the following website:

> http://www.thefiscaltimes.com/Articles/2012/05/10/Guess-
> Whos-Funding-the-Super-PACs.aspx#page1

70.     The statement which, upon information and belief, was published by Ortiz reads

as follows: "Sam Hassell is a liar, cheat and a thief. He diverted $1.2 million away from our

company into his own." A copy of said statement is attached hereto as Exhibit B and

incorporated herein by reference.

71.     Upon information and belief, Ortiz knowingly, willfully and with actual malice

published the above statement so that it reached one or more persons other than Hassell in an

effort to harm Hassell personally and in his business, trade and profession.

72.  .   The above described statement is false.

73.     Upon information and belief, Ortiz intended that the statement harm Hassell

personally and in his business, trade and profession.

74.     Upon information and belief, any person reading the Internet article and Ortiz's

comment below the article would have reasonably understood that Ortiz's statement was

intended to harm Hassell personally and in his business, trade and profession.

75.     Upon information and belief, at the time of publication Ortiz either new the

statement was false or reasonably should have known the statement was false.

12

76.    Upon information and belief, Ortiz has also slandered Hassell to some of his long time business contacts and clients with whom he regularly conducts a substantial amount of business by similarly making false statements about Hassell to those business contacts that Hassell has diverted funds and is a liar and a thief and diverted a substantial amount of money owed to Ortiz for his own benefit.

77.    Upon information and belief, the slanderous statements by Ortiz to Hassell's business contacts and clients with whom Hassel regularly conducts business are knowingly false and made by Ortiz with actual malice with an intent to cause substantial damage to Hassell, personally, and his business, trade and profession.

78.    Hassell is entitled to monetary damages to compensate him for the harm caused by the libelous statement and slanderous comments described above and he is entitled to punitive damages from Ortiz as a result of her actual malice in publishing the statement.

WHEREFORE, Plaintiffs Marketel Media, Inc. and Samuel T. Hassell respectfully pray this Court as follows:

1.    For a judgment declaring that Mediapotamus and/or Ortiz have been properly compensated by Marketel;

2.    For a judgment declaring that Hassell did not divert corporate opportunities of Marketel;

3.    For a judgment declaring that Hassell is a 51% shareholder in Marketel and Ortiz is a 49% shareholder in Marketel;

4.    For a judgment awarding Marketel Media, Inc. monetary damages in an amount in excess of $10,000.00 for the reasons set forth herein;

13

5.    For an award of punitive damages against Ortiz for the libelous statement and slanderous comments alleged herein which were published and made with actual malice;

6.    That this Verified Complaint be accepted as an affidavit in support of Plaintiffs' claims in this matter;

7.    For a trial by jury on all issues so triable;

8.    A judgment for all reasonable attorneys' fees and costs incurred by Marketel and Hassell to the extent permitted, if any, by applicable law; and

9.    For such other and further relief as to the Court may deem just and proper.


This the 15th day of May, 2013

William S. Cherry III, NCSB #33860
Of Manning, Fulton & Skinner, P.A.
*Attorneys for Plaintiffs*
3605 Glenwood Avenue, Suite 500
Raleigh NC 27612
P.O. Box 20389
Raleigh, North Carolina 27619-0389
Telephone:  (919) 787-8880
Telefax:      (919) 325-4604
cherry@manningfulton.com


753283 v3.WSC.25576.L43478

14

STATE OF NORTH CAROLINA    :

COUNTY OF WAKE:

### VERIFICATION

Sam T. Hassell, being duly sworn, deposes and says that he is the Majority Shareholder and President of Marketel Media, Inc., Plaintiff in the above referenced action, and as such is authorized to make this verification on behalf of Marketel Media, Inc. and in his individual capacity; that he has read the foregoing Complaint, and that the facts set forth therein are true to his own knowledge, except as to matters therein set forth upon information and belief, and as to such matters, he believes them to be true.

<div align="right">
Sam T. Hassell, individual and as Majority Shareholder and President of Marketel Media, Inc.
</div>

WAKE COUNTY, NORTH CAROLINA

Sworn to and subscribed before me
this day by Sam T. Hassell.

Date: _May   15_____, 2012.



Notary Public: _Kathleen A. Kolarsky_____ *(print/type name)*

My Commission Expires: _11-22-15_____

<div style="border:1px solid black; display:inline-block; padding:4px;">
KATHLEEN A. KOLARSKY<br>
NOTARY PUBLIC<br>
WAKE COUNTY, N.C.
</div>

# EXHIBIT A

# LIEBERG OBERHANSLEY & STROHMEYER, LLP

## A CALIFORNIA LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

41911 Fifth Street, Suite 300
Temecula, California 92590
Telephone (951) 699-6600
Facsimile (951) 699-6616

JON H. LIEBERG, ESQ.
jlieberg@losglaw.com

February 14, 2013

<u>*Via Certified Mail to*</u>
Marketel Media, Inc.
Attn: Board of Directors
33175 Temecula Parkway
Suite A203
Temecula, CA 92592

<u>*Via E-mail shassell@marketelmedia.com*</u>
<u>*and Certified Mail*</u>
Marketel Media, Inc.
Attn: Sam Hassell and Board of Directors
111 Windel Drive
Suite 201
Raleigh, NC 27609

Re:     *Formal Demand for Marketel Media, Inc. and Sam Hassell to Remedy
        Breaches of Fiduciary Duty and Unauthorized Seizures of Corporate
        Opportunity; Request For Inspection of Corporate Books and Records*

Dear Marketel Media, Inc., Members of the Board of Directors of Marketel Media, Inc., and Sam
Hassell:

Kelly Jenkins-Ortiz has retained the services of this firm in the above-referenced matter.
This letter shall serve as Ms. Ortiz' formal demand (as a shareholder) upon Marketel Media, Inc.
("Marketel") and Sam Hassell (as the other shareholder), pursuant to North Carolina General
Statute section 55-7-42, to take the following actions:

1.     Compensate Marketel for all breaches of fiduciary duties by Sam Hassell, Robert
       deRosset, and Mr. deRosset's law firm, Young Moore & Henderson P.A. – each
       individually, for breaches of fiduciary duties, actual fraud, constructive fraud, conversion,
       self-dealing, and civil conspiracy, among others. Each has conspired and engaged in
       unauthorized seizures of Marketel's corporate opportunities, including but not limited to,

the acquisition and concealment of over $1.2 million worth of business from "Winning Our Future" through the guise of Intelimarc, Inc. (a corporation apparently wholly owned by Mr. Hassell). Mr. Hassell owes fiduciary duties to Marketel (and Ms. Ortiz) as a controlling shareholder and officer, while Mr. deRosset and Young Moore & Henderson are Marketel's attorneys.

2. Compensate Marketel for all other unauthorized seizures of corporate opportunities.

3. Compensate Marketel and Ms. Ortiz for the unauthorized and unagreed change of income allocation. Ms. Ortiz's profits have dropped by a substantial amount due to Mr. Hassell's unilateral change of income distribution. Ms. Ortiz did not approve of this unilateral change and as such, hereby demands full compensation based upon the prior income allocation formula.

4. Purchase Ms. Ortiz' ownership in the corporation, *after* Mr. Hassell and Mr. deRosset has compensated Marketel for all unauthorized seizures of corporate opportunities. The buyout price shall be determined after a business valuation and inspection of all corporate books and records. Such is reasonably necessary for the protection of Ms. Ortiz' rights and interests from further violations of fiduciary duties.

In addition, Ms. Ortiz demands that Marketel and Mr. Hassell make available all corporate records within five (5) business days of this letter. The purpose of this inspection is to determine the value of Ms. Ortiz' interest in the corporation and the corporation's financial condition, to communicate with all other purported shareholders, and to determine the extent of waste and mismanagement within the corporation. Please confirm that these records will be made available; this office will coordinate with a copy service for inspection and copying during business hours at the North Carolina office. See North Carolina General Statutes 55-16-03(a) (shareholder's agent and attorney have the same inspection rights as the shareholder). If you do not intend to make these following records available, then so state to avoid further liability for unnecessary costs and your reasons for denying access. The records made available shall include:

a. articles of incorporation with all amendments;
b. bylaws with all amendments;
c. directors' resolutions creating and defining any class or series of shares that are outstanding pursuant to those resolutions;
d. minutes of all shareholders' meetings and records of all action by shareholders without a meeting for the past three years;
e. financial statements and all communications to shareholders within the past three years;

f.  all names and business addresses of the current directors and officers;

g.  most recent annual report;

h.  records of any final action taken by the board of directors or by a committee of the board acting in place of the board on behalf of the corporation;

i.  minutes of any shareholders' meetings and records of action by shareholders without a meeting more than three years old;

j.  all accounting records of the corporation;

k.  record of shareholders;

l.  all other corporate records;

m.  the "long and expensive financial research" referred to in Mr. Hassell's e-mail of 2/14/13;

n.  all documents pertaining to the "$80,000" in overpayments purportedly made to consulting companies referred to in Mr. Hassell's e-mail of 2/14/13;

o.  all requests for refunds on alleged overpayments made to any consulting companies referred to in Mr. Hassell's e-mail of 2/14/13;

p.  the canceled check showing $18,000 for the initial capital contribution claimed by Mr. Hassell, as referred to in his e-mail of 2/14/13;

q.  all checks alleged to be forged by Ashley Long;

r.  copies of statements identifying all fraudulent debit card charges in the Marketel account, as alleged in Mr. Hassell's 2/14/13 e-mail;

s.  all communications – including but not limited to letters, e-mails, or memoranda – between Marketel and its attorneys, Mr. deRosset and Young Moore & Henderson, in the last three years;

t.  all communications – including but not limited to letters, e-mails, or memoranda – between Mr. Hassell and Mr. deRosset or any other member of Young Moore & Henderson in which Marketel, Ms. Ortiz, Ashley Long, or Christina (Mr. Hassell's prior assistant) are discussed in the last three years;

u.  copies of all invoices from Mr. deRosset or Young Moore & Henderson to Marketel in the last three years;

v.  copies of all invoices from Mr. deRosset or Young Moore & Henderson to Mr. Hassell for services relating to Marketel in the last three years;

w.  all agreements between Marketel and Mr. deRosset or Young Moore & Henderson;

x.  all checks from Marketel to Mr. deRosset or Young Moore & Henderson;

y.  all prepared and/or filed police reports of embezzlement, fraud, or other crimes, as against Ashley Long or Christina (Mr. Hassell's prior assistant).

Please respond to this letter <u>as soon as possible</u> to prevent the institution of an unnecessary lawsuit. As this firm represents Ms. Ortiz, please forward all further communications to me and not to Ms. Ortiz personally.

Very truly yours,

Jon H. Licberg

JHL:jsl
cc: Client

# EXHIBIT B


DO YOU SUPPORT TRADTIONAL MARRIAGE? VOTE NOW!

REGISTER NOW!

SEARCH

## POLICY + POLITICS

### Guess Who's Funding the Super PACs?



Photo: Comedy Central


14 Ideas to Promote your Business

The Fiscal Times FREE Newsletter

E-mail

Share

Type Size: Small

Like 3 people like this.

By MARCUS STERN, KRISTINA COOKE and ALEXANDER COHEN, Reuters
May 10, 2012

December 2011 was a busy month for supporters of presidential candidate Newt Gingrich. The former speaker of the House had surged ahead of his Republican rivals in several polls. Suddenly he was being barraged by negative TV ads produced by Restore Our Future, a Super PAC for rival candidate Mitt Romney.

Gingrich did not have the money to retaliate. Individual donations in federal elections are restricted to $2,500. He needed his own Super PAC that could receive unlimited contributions.


ELECTION 2012
COMPLETE COVERAGE

Ever since the Supreme Court's 2010 decision in the *Citizens United* case paved the way for Super PACS, they have been a legitimate new tactic for political campaigns. As far as can be determined, Winning Our Future (WOF), the pro-Gingrich political action committee, did not do anything impermissible under campaign finance laws. But a look at its regular reports to the Federal Election Commission reveals a degree of legerdemain that appears commonplace in FEC records and makes it difficult for the public to know who ends up with the record amounts of money flowing into the political system today.

**RELATED:** Bill Bradley: Super PACs Are Killing Democracy

"Opaque transactions in politics undermine public confidence in the process," said Meredith McGehee, owner of McGehee Strategies, which works on public interest advocacy, and policy director at the Campaign Legal Center.


# POLICY + POLITICS

---

## Guess Who's Funding the Super PACs?



Photo: Comedy Central

**Dental Implant Warnings**
symptomfind.com/CosmeticDentalCa...
What You Should Know Before Getting
Dental Implants. Read Expert Advice



---

The Fiscal Times FREE Newsletter

E-mail

| Share | | | a2 | Type Size: Small |

Like   3 people like this.

May 10, 2012

PACs are required to report expenditures, including recipient and amount. Bulk checks to media buyers routinely run into the millions of dollars without disclosing subcontracts and other expenses. Side agreements over splitting of the discounts from the broadcasters are not subject to FEC disclosure. "Our system is based on the idea that (Super PACs) can basically spend money however they see fit, and if your donors think the committee is not spending it wisely, then they can decide not to give further," said FEC Commissioner Cynthia Bauerly.

**'SECRET' COMPENSATION**

Tyler is a seasoned political operative who began advising Winning Our Future in December. He described in the harshest terms what he says is the common industry practice of PAC staff secretly divvying up portions of the discount: "Kickbacks ... come back either to the campaign or the media vendor, in many cases the campaign manager. So you'll get a congressional campaign manager who on the surface you think is making $50,000-$60,000. The fact is he could be making hundreds of thousands of dollars. You have no idea because he's being paid separate from what you're seeing."

Total broadcast and cable spending during the 2012 race is projected to be $3 billion. That means as much as $450 million could be divvied up among political consultants and campaign or PAC staff according to negotiated fee agreements and informal side deals.

Tyler disparaged this opaque system of fee sharing as a hallmark of big-name political consultants. He didn't name any specifically, but he says WOF avoided their help. That is clear that some of the pro-Gingrich Super PACs vendors engaged in some opacity.

WOF's TV ad buys were handled by Media Advantage, which was incorporated in Baton Rouge, Louisiana, on December 6, 2011 – a week before WOF submitted its organizing

**Dental Implant Warnings**
symptomfind.com/CosmeticDentalCare
What You Should Know Before Getting
Dental Implants. Read Expert Advice


**Resell Google Apps**
google.com/apps/resellers
Your customers, our technology. A match
made in the cloud.


**Sage Business Software**
Na.Sage.com
Easily Manage Your Small Business
Processes W/ Sage. Learn More Now!


**Do you support marriage?**
Townhall.com/Marriage
Do you believe in traditional marriage?
Vote now!


**NIH SBIR/STTR: Get Funded**
www.sbir-sttrgrantshelp.com
Over $95 million in grant/contract funding
raised since 2008


**Free Grants For College**
EveryManBusiness.com/GovtGrants
Make Your College Education Happen.
Qualify For Free Government Grants!


**Political campaigns**
www.ngpvan.com
Off or online - the tools you need to run a
winning race


**VerticalResponse®**
www.VerticalResponse.com/FreeTrial
More Free Features. No Contracts. Easier
to Use. Better Support.


## Our Most Popular

statement to the FEC. The owner was listed as Laura Lancaster, of Baton Rouge, who did not return phone calls from Reuters. The real buyer, according to Tyler, was Ken Kurson, a partner and executive vice president of Jamestown Associates in Princeton, New Jersey. Neither Kurson nor Jamestown CEO Larry Weitzner would comment for this story.

Tyler said that when WOF first approached Kurson, Jamestown said it had a conflict: It was already handling TV ads for the pro-Rick Perry Super PAC Make Us Great Again. While media buyers have no obligation to avoid such conflicts the way law firms or investment banks do, they prefer not to advertise them. Commercial clients may not want to be linked to certain politicians, and political clients may worry about leaks inside the organization.

RELATED: What Mitt Romney Spent to Secure the GOP Nomination

Political vendors sometimes work for rival campaigns because there are more candidates than companies that can execute a good national media-buying strategy, according to industry experts. To avoid disclosing their identity in FEC records and to avoid leaks within the organization, one prominent media consultant explained, they spin off a separate corporation. How separate is another matter.

Jamestown Associates "just told Ken it would be fine to set up his own company," Tyler said in explaining why Kurson established Media Advantage in December.

Kurson was behind another mysterious WOF vendor, according to Tyler. Empire Creative is shown in FEC reports as receiving $196,875 to produce ads. This company was incorporated in Delaware on October 31, 2011, by National Registered Agents Inc. An official with National Registered Agents said the company has an agreement with its customers to keep their identities confidential. The incorporation documents reveal nothing beyond a post office box number in New York City.

## SPOTTY RECORDS

The name of Sam Hassell does not appear on any FEC reports from Winning Our Future, but Reuters discovered that he received the largest chunk of money from the Super PAC. Payments totaling more than $8.1 million were made to his two companies. He created Marketel Media Inc five months before WOF was formed and Intelimare Inc just nine days before.

Although Hassell is the sole stakeholder in Intelimare, his name is not on its incorporation documents. Two local attorneys are cited instead. Because December was so hectic, said Hassell, he had his brother's law firm do the work. WOF paid Intelimare $1.2 million for Internet and email advertising, according to FEC records.

In recent years, Hassell sold radio ads for Salem Radio Network, a national network of stations that feature Christian music and conservative talk show hosts. He left in May 2011 to become chief executive officer of one of its clients, the Association of Mature American Citizens (AMAC), a for-profit company that offers members discounts on various goods and services. When Hassell incorporated Marketel in July, AMAC was its only client. WOF is now a second.

WOF bought $1.9 million in radio air time, according to Smart Media Group, a political advertising company in Alexandria, Virginia, that monitors political ads on TV, radio and cable outlets. According to its reports to the FEC, WOF paid Marketel at least $2.9 million solely for radio advertising.

◀◀ Previous    1 | 2 | 3                                          Next ▶▶


Share


The Myth of Being 'Rich' at $250,000 a Year


More Democrats Have That 'Sinking' Feeling

The 8 Cheapest Houses in America


Greece Already Close to Breaking Point



15 Ways to Save the Federal Budget   More


Click to View Slideshow

## More from the Web

- Malaysia to unleash up to $2.6bn in IPOs (Financial Times)
- Venezuela's Opposition in a Favorable Position Amid Political Instability (World Politics Review)
- Mitt Romney is now the hot favorite

## We Recommend

- If Benghazi Was a Cover Up, How High Did It Go? (The Fiscal Times)
- The Real Test for Obamacare is 5 Months Away (The Fiscal Times)
- Benghazi eMails Show Officials Lied

for the Presidential Race -- In 2016 (IrishCentral)
- Are Germans Really Poorer Than Spaniards, Italians And Greeks? (Social Europe Journal) ...... . ..
- Trustee to Seize and Liquidate Even the Stored Customer Gold and Silver Bullion From MF Global (Jesse's Café Américain)
- Reports Wesley Sneijder Agrees to Join Tottenham Hotspur From Inter Milan in January (NESN)

- About Terror Attack (The Fiscal Times)
- Why Your Hospital Bill Is Totally Negotiable (The Fiscal Times)
- Detroit Needs a Miracle As It Sinks Deeper in Debt (The Fiscal Times)
- Obama Urges Grads to Get Political Still Uphill Fix... (The Fiscal Times)

You are here: Home > *Policy + Politics*


ACT NOW
$29.99/mo
Charter

(what's this)

## On Our Radar

Congress Packs Defense Bills with Millions in Pork
Read More

Obama's War on Successful Americans Hits 401(K)s
Read More

6 Co...
Quit
Read

## Add New Comment                                            Login

Type your comment here.

Post as ...

Real-time updating is enabled. (Pause)

### Showing 4 comments                          Sort by popular now ▾

**Michael Bindner**

If they get too outlandish, even the Supreme Court will not continue to rescue them. Eventually, there will be blowback from the voters. This kind of thing is why Senators were originally elected by state legislatures and President's by an Electoral College with little campaigning. It may lead to indirect voting for the executive in the future if they make people sick enough of this.

1 year ago · 1 Like                                        Like · Reply

**Kelly**

Sam Hassell is a liar, cheat and a thief.  He diverted $1.2 million away from our company into his own.

4 months ago                                             Like · Reply

**Bob**

It's terrible, isn't it. But you failed to mention th activities of Obama's PACs. There's some real dirt there.

1 year ago                                                 Like · Reply

**Eleanore Whitaker**

It was just a matter of time until the uber rich found a way to buy the government they want. How else can they take over the country?

1 year ago                                                 Like · Reply

## Sign up to get our *Free Newsletters!*

Sign Up to Get the Fiscal Times & Our News Alerts.

## Connect to *The Fiscal Times*

Facebook   Twitter   Google+   RSS

blog comments powered by DISQUS

You are here: *Guess Who's Funding the Super PACs?*

The Source For All Things Fiscal
© 2009-2013 The Fiscal Times. All rights reserved.

STATE OF NORTH CAROLINA    :

COUNTY OF WAKE    :

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13-CVS-06922

MARKETEL MEDIA, INC. and
SAMUEL T. HASSELL,

          Plaintiffs,

     v.

MEDIAPOTAMUS, INC. and
KELLY JENKINS ORTIZ,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)

**AFFIDAVIT OF SERVICE**

William S. Cherry, III, being first duly sworn, deposes and says:

1. That I am counsel for Plaintiff, in the above entitled action.

2. That as counsel for plaintiff I had a Civil Summons issued for attachment to the filed Complaint in the above described action on May 15, 2013.

3. That the Civil Summons with a copy of the Complaint was duly served on defendant Mediapotamus, Inc. by Federal Express (Tracking No. 799771217843), adult signature required, at the following address:

> Mediapotamus, Inc.
> 33175 Temecula Parkway, Suite A203
> Temecula, CA  92592

The "Signature Page" is attached hereto as Exhibit A and incorporated herein by reference as evidence that such service was received by defendant on May 16, 2013.

4. That the Civil Summons with a copy of the Complaint was duly served on defendant Kelly Jenkins Ortiz by Federal Express (Tracking No. 799771310679), adult signature required, at the following address:

Kelly Jenkins Ortiz
24087 Semillon Lane
Murrieta, CA   92562

The "Signature Page" is attached hereto as Exhibit B and incorporated herein by reference as evidence that such service was received by defendant on May 16, 2013.

This the __16th__ day of __May__, 2013.

William S. Cherry, III, NCSB # 33860
MANNING FULTON & SKINNER P.A.
Attorneys for Plaintiffs
3605 Glenwood Avenue, Suite 500
Post Office Box 20389
Raleigh, North Carolina   27619-0389
Telephone:     (919) 787-8880
Facsimile:      (919) 325-4604
E-Mail:          cherry@manningfulton.com

STATE OF NORTH CAROLINA     :
COUNTY OF WAKE                      :

Sworn to and subscribed before me by
William S. Cherry, III this the _16th_
day of _May_, 2013.

_Kathleen A. Kolarsky_
_Kathleen A. Kolarsky_____, Notary Public
(Type of Print Notary Name)

My Commission Expires: _11-22-15_



KATHLEEN A. KOLARSKY
NOTARY PUBLIC
WAKE COUNTY, N.C.

753585.25576-L43478

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing *Affidavit of Service* was duly served this day on all parties by forwarding a copy thereof enclosed in a postage paid envelope deposited in the United States mail, addressed as follows:

Mediapotamus, Inc.
33175 Temecula Parkway, Suite A203
Temecula, CA  92592

Kelly Jenkins Ortiz
24087 Semillon Lane
Murrieta, CA  92562

This the   16th   day of   May  , 2013.

William S. Cherry, III, NCSB # 33860
MANNING FULTON & SKINNER P.A.
Attorneys for Plaintiffs
3605 Glenwood Avenue, Suite 500
Post Office Box 20389
Raleigh, North Carolina  27619-0389
Telephone:     (919) 787-8880
Facsimile:     (919) 325-4604
E-Mail:        cherry@manningfulton.com



May 16,2013

Dear Customer:

The following is the proof-of-delivery for tracking number **799771217843**.

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Receptionist/Front Desk |
| Signed for by: | H.CALIHAN | Delivery location: | 33175 TEMECULA PKWY A632 |
| | | | TEMECULA, CA 92592 |
| Service type: | FedEx Priority Overnight | Delivery date: | May 16, 2013 09:59 |
| Special Handling: | Deliver Weekday | | |
| | Adult Signature Required | | |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 799771217843 | Ship date: | May 15, 2013 |
| | | Weight: | 0.5 lbs/0.2 kg |

Recipient:
Mediapotamus, Inc.
33175 Temecula Parkway
Suite A203
TEMECULA, CA 92592 US

Reference

Shipper:
William S. Cherry, III
MANNING FULTON & SKINNER, PA
3605 GLENWOOD AVENUE
SUITE 500
RALEIGH, NC 27612 US
25576-L43478

Thank you for choosing FedEx.

**EXHIBIT A**



May 16,2013

Dear Customer:

The following is the proof-of-delivery for tracking number **799771310679**.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered to: | Residence |
| Signed for by: | D.DOOS | Delivery location: | 24087 SEMILLON LANE |
| | | | Murrieta, CA 92562 |
| Service type: | FedEx Priority Overnight | Delivery date: | May 16, 2013 09:57 |
| Special Handling: | Deliver Weekday | | |
| | Residential Delivery | | |
| | Adult Signature  Required | | |



## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 799771310679 | Ship date: | May 15, 2013 |
| | | Weight: | 0.5 lbs/0.2 kg |

Recipient:
Kelly Jenkins Ortiz
24087 Semillon Lane
Murrieta, CA 92562 US

Reference.

Shipper:
William S. Cherry, III
MANNING FULTON & SKINNER, PA
3605 GLENWOOD AVENUE
SUITE 500
RALEIGH, NC 27612 US
25576-L43478

Thank you for choosing FedEx.

**EXHIBIT B**