IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:13-CV-427-D

| | | |
|---|---|---|
| MARKETEL MEDIA, INC., | ) | |
| SAMUEL T. HASSELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | (No. 5:13-CV-427-D) |
| | ) | |
| MEDIAPOTAMUS, INC., | ) | |
| KELLEY J. ORTIZ, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| KELLEY JENKINS ORTIZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | (No. 5:13-CV-693-D) |
| | ) | |
| SAMUEL T. HASSELL, | ) | |
| MARKETEL MEDIA, INC., | ) | |
| INTELIMARC, INC., and | ) | |
| DOES 1–10, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

On June 13, 2013, Kelly J. Ortiz and Mediapotamus, Inc. ("defendants"), timely removed to this court a North Carolina state-court complaint filed against them by Samuel T. Hassell and Marketel Media, Inc. ("plaintiffs"). See [D.E. 1]. In their complaint, plaintiffs seek declaratory relief and damages for defendants' alleged negligence in maintaining business records and for Ortiz's alleged defamation and slander of Hassell. See [D.E. 1-1] 11–17.

On July 19, 2013, defendants asked the court to transfer the case to the United States District

Court for the Central District of California, where defendants had filed an action against plaintiffs and Intelimarc, Inc. ("Intelimarc"). See [D.E. 12]; Complaint, Ortiz v. Hassell, No. 5:13-cv-730-GHK (C.D. Cal. Apr. 22, 2013), [D.E. 1]. On October 1, 2013, the United States District Court for the Central District of California transferred that action to this court, pursuant to 28 U.S.C. § 1406(a). Letter of Transfer, Ortiz v. Hassell, No. 5:13-cv-730-GHK (C.D. Cal. Oct. 1, 2013), [D.E. 29-1]. On November 8, 2013, this court consolidated the two actions and denied defendants' motion to transfer the case to California [D.E. 20].

On December 23, 2013, the court denied plaintiffs and Intelimarc's motion to dismiss defendants' claims and permitted defendants to amend three claims in their complaint [D.E. 23]. On January 6, 2014, defendants filed a second amended complaint that alleged ten claims. See Second Am. Compl. [D.E. 24]. On October 30, 2014, Hassell and Intelimarc ("movants") moved for summary judgment on defendants' claims against them [D.E. 47] and filed a supporting memorandum [D.E. 50]. On November 20, 2014, defendants responded in opposition [D.E. 55]. On December 4, 2014, movants replied [D.E. 62]. As explained below, the court grants in part and denies in part movants' motion for summary judgment.

I.

Ortiz and Hassell first met in July 2010. Ortiz Decl. [D.E. 55-2] ¶ 2. At that time, Hassell worked for Salem Radio Representatives ("Salem"). Hassell Dep. [D.E. 47-2] 11 (deposition pages 34–36). Ortiz was the sole-shareholder and president of Mediapotamus, Inc. ("Mediapotamus"), a company that focused on "per inquiry" radio advertising. Ortiz Dep. [D.E. 47-3] 9–10 (deposition pages 29–32); Ortiz Decl. [D.E. 55-2] ¶ 1. Ortiz and Hassell worked together and developed a "good working relationship." Ortiz Dep. 120. While working for Salem, Hassell did advertising and marketing work for Dan Weber, the founder of the Association of Mature American Citizens

2

("AMAC"). Hassell Dep. 36–37, 103. In the spring of 2011, Hassell approached Ortiz about a plan for one of Hassell's companies, Conservative Retired People ("CRP"), to buy AMAC, and the possibility of Ortiz being on CRP's board of advisors. Ortiz Dep. 120–21.

In May or June of 2011, Hassell became CEO of AMAC. Hassell Dep. 36–37. As part of Hassell's compensation package, AMAC agreed to allow Hassell to handle, and thereby earn commissions from, AMAC's advertising. Id. 41. Around the same time, Hassell and Ortiz began discussing the formation of a new company, Marketel Media ("Marketel"). Ortiz Decl. ¶ 2; Hassell Dep. 42–43. Hassell wanted Ortiz to "grow [Marketel's] business by bringing in clients. . . . help with the admin and to be the face of Marketel." Hassell Dep. 45, 51; Ortiz Decl. ¶ 2; Ortiz Dep. 123 ("[Hassell] had left Salem to become the CEO of AMAC. And part of his compensation was getting to handle AMAC advertising, but since he was the CEO of AMAC, he needed another company and specifically someone else to be the face of it, so it didn't look too bad.").

On June 7, 2011, Hassell sent Ortiz an Agreement for Ownership of Marketel Media ("Marketel Ownership Agreement"), which she "immediately signed and returned." Ortiz Decl. ¶ 3; [D.E. 55-7]; [D.E. 55-3] 2 (KJO 1). Hassell told Ortiz that there would be a "50/50 split" in the division of shares. See [D.E. 55-3] 2 (KJO 1). The agreement reflected this split. See [D.E. 55-7] 4 (KJO 4).

On June 26, 2011, Hassell, in his role as AMAC's CEO, sent an email in which he referred to "Kelly Ortiz with Marketel Media" as "the lead agency." See [D.E. 55-3] 10 (KJO 256). Hassell also noted that Ortiz would be the "main contact for Amac." Id.; Ortiz Decl. ¶ 6.

On July 6, 2011, Hassell filed Marketel's incorporation papers with the North Carolina Secretary of State. See [D.E. 47-6] 14–16 (MRK 773–75). Hassell was listed as the sole incorporator. Id.

3

The parties dispute the nature of Marketel's organization and compensation structure. According to Hassell, Marketel was an "umbrella" organization through which various associated entities pooled resources and provided advertising services. See Hassell Decl. [D.E. 47-6] ¶¶ 7–12. Hassell contends that "[n]either one of [he or Ortiz] ever worked for Marketel. That's the whole model." Hassell Dep. 52. Instead, Ortiz's and Hassell's relationships with Marketel went through their respective companies, including Mediapotamus. See id. 52–57. Furthermore, according to Hassell, the purpose of Marketel was to make money for the associated entities, rather than for Marketel itself. Id. 69–70. Marketel would receive a commission on media buys that it purchased for its clients. Id. 73. After paying for certain operating expenses, the remainder of the commission would go to the "associate entity" that brought in the client. Id. 129. That entity would then, in turn, pay other associate entities for work done for that client. Id. Thus, according to Hassell, the associated entities, and not Marketel, made profits by being compensated by Marketel for work done for Marketel's clients. Id. 69–75. Moreover, there was no "strict compensation plan" for the administrative work that Ortiz—through Mediapotamus, in Hassell's view—did. Id. 72. Hassell also asserts that the Marketel Ownership Agreement "does not address in any way how [Hassell's and Ortiz's] respective entities under the Marketel compensation model would be compensated for services rendered to, for, or on behalf of Marketel." Hassell Decl. ¶ 15.

Ortiz describes Marketel as a "traditional advertising agency featuring pay-in-advance or pay for air time advertising." Ortiz Decl. ¶ 7. According to Ortiz, Mediapotamus never had a business relationship with Marketel. Id. ¶ 16. Ortiz disputes that Marketel was an "umbrella" brand, and she asserts that "[a]ll of Marketel's business was directly with its clients." Id. ¶ 22. Ortiz alleges that her 50% ownership of Marketel entitled her to 50% of Marketel's profits and that she worked "full time for Marketel." Id. ¶ 11. Ortiz claims that her role at Marketel was "to place all the advertising,

4

manage the existing campaigns, invoice and collect from [the] clients, pay [the] vendors, pay [the] operating expenses, and distribute the profits equally to Hassell and [Ortiz]." Id. ¶ 9; see Ortiz Dep. 108–09. Hassell's role was "to engage in client relations and obtain new clients." Ortiz Decl. ¶ 10.[1]

When Marketel was formed, AMAC was its only client. Ortiz Dep. 123. Ortiz and Hassell split equally the net proceeds from Marketel's commissions from its AMAC work. Hassell Decl. ¶¶ 13–14; Hassell Dep. 91–92. Ortiz offered to bring Mediapotamus's per-inquiry advertising business to Marketel, but, after further discussion, she and Hassell decided that the per-inquiry business was "not lucrative enough for Marketel to do" and did not fit within Marketel's traditional advertising services. Ortiz Decl. ¶ 17; Ortiz Dep. 166–67; Hassell Decl. ¶ 11.

In late 2011, Hassell began talking with Winning Our Future ("WOF"), a super PAC that supported then-GOP presidential candidate Newt Gingrich. Hassell Dep. 103–04; Ortiz Decl. ¶ 8. On December 7, 2011, Hassell sent Ortiz an email in which he noted that he was "meeting with Newt's people in a few minutes." [D.E. 55-3] 31. Around the same time, Hassell formed Intelimarc, of which he was the sole employee. Hassell Dep. 104–05. On or about December 13, 2011, Intelimarc signed an "Agency of Record" agreement with WOF. See [D.E. 47-5] 5–7. Hassell asserts that he had Intelimarc, rather than Marketel, sign an agreement with WOF because, among "a variety of reasons," "Marketel Media was not in the business of consulting with political organizations, strategy development for political campaigns, the donor development stuff." Hassell Dep. 105–06. Ortiz asserts, however, that Hassell represented Marketel during his meetings with

---

[1] In her memorandum, Ortiz repeatedly cites two deposition errata sheets. See [D.E. 47-3] 76–84. The court has reviewed the errata sheets and finds that Ortiz has, in many instances, impermissibly made "significant, material changes that modify and contradict" her original testimony. See William L. Thorp Revocable Trust v. Ameritas Inv. Corp., No. 4:11-CV-193-D, 2014 WL 4923597, at *4–5 (E.D.N.C. Sept. 30, 2014). Thus, the court does not rely on these errata sheets. See id.

WOF. Ortiz Decl. ¶ 26.

On December 14, 2011, Hassell emailed Ortiz and Christina Bledsoe, an AMAC employee, he noted a client, "Winning Our Freedom," and said that the agency of record was Intelimarc. [D.E. 47-5] 9–10 (KJO 648–49). He also listed Marketel and Strategic Media, Inc., as "Buying Agencies for Intelimarc, Inc." Id. Ortiz denies seeing this email and argues, in the alternative, that "[e]ven if Hassell did send it, it would have been such a new and prospective project, that it would not have caught [her] eye while it was yet another 'potential new client' and one of hundreds of emails [she] received each day." Ortiz Decl. ¶ 26.

Hassell alleges that he had daily communication with Ortiz about Marketel and that he "informed [Ortiz] that Intelimarc would be the agency [of] record for Winning Our Future and that it would contract out certain work to Marketel." Hassell Decl. ¶ 17; see Hassell Dep. 112–113. Hassell further claims that Marketel paid a commission to Intelimarc for some WOF work but that WOF paid Intelimarc directly for "all work outside of the traditional advertising services." Hassell Decl. ¶¶ 18–19. Ortiz disagrees and asserts that "Hassell never claimed that WOF was Intelimarc's client, and he never showed [her] the agency of record agreement prior to [her] lock out." Ortiz Decl. ¶ 30; see also Ortiz Dep. 209.

On December 19, 2011, Hassell emailed two people associated with WOF and noted that "Intelimarc is the Agency of Record for Winning Our Future to handle specifically the radio, Internet and email buys." [D.E. 47-5] 31–32. The email also stated that "Intelimarc is subcontracting with Marketel Media, Inc. to place National Radio, Internet and Email buys." Id. The email does not list Ortiz as a recipient. Id.

On December 23, 2011, Hassell and Ortiz executed the Marketel Ownership Agreement that Hassell first sent to Ortiz in June 2011. [D.E. 55-7] 4–5 (KJO 4–5).

6

On January 13, 2012, Ortiz received an email asking her to confirm a number of Marketel invoices for advertising. Id. 35. This email also noted, under "Other Invoices," an invoice to Intelimarc for "$52,500 for internet and Email advertising." Id. Ortiz claims she did not see this email until "after Hassell forced [her] out." Ortiz Decl. ¶ 28; but see Ortiz Dep. 205–06, 209.

On January 31, 2012, an advertiser emailed Ortiz copies of two invoices for Intelimarc. [D.E. 47-5] 37–39. One invoice, with a total of $28,512.06, noted "Re: Winning Our Fu[]ture, PAC." Id. 38. Ortiz claims that she thought this invoice related to a one-time purchase that Intelimarc made for Super Tuesday, a purchase that she agreed to because she was traveling at the time and was therefore unavailable to execute the media buys. Ortiz Decl. ¶¶ 28, 30; Ortiz Dep. 207–08.

On February 29, 2012, Becky Burkett ("Burkett"), a WOF employee, emailed a number of people, including Hassell and Ortiz. [D.E. 47-5] 44. In the email, Burkett referenced and approved an invoice, billed to WOF by Intelimarc, for a Super Tuesday buy. See id. 44–48. Ortiz denies having seen this email or the attached invoice. Ortiz Dep. 214–16.

In late April or early May 2012, when Newt Gingrich ended his campaign for the Republican nomination for president, the WOF campaign "came to an abrupt end, with no prospect of return." Hassell Decl. ¶ 22. From May 1 to May 3, 2012, Hassell and Ortiz met in New York "to discuss how Marketel would proceed going forward." Id. ¶ 23; Ortiz Decl. ¶ 15. Hassell suggested that Ortiz should give 1% of her equity in Marketel to Hassell, resulting in Hassell being a 51% shareholder and Ortiz being a 49% shareholder. Hassell Decl. ¶ 24. Ortiz "agreed to the logic behind what [Hassell] suggested." Ortiz Dep. 180–81.

During the spring and summer of 2012, Hassell spoke with Sherrie Roberts ("Roberts") and Rob Davis ("Davis") about joining Marketel in a joint-venture arrangement. Hassell Decl. ¶¶ 25–26. Hassell explained to them his view of Marketel as a "pass through entity." Roberts Decl. [D.E. 47-7]

7

¶¶ 5–10; Davis Decl. [D.E. 47-8] ¶¶ 5–7; Hassell Decl. ¶¶ 26–27. Ortiz and Hassell also spoke about bringing in additional people in a "joint venture enterprise." Ortiz Dep. 156–57. Roberts, through her company Radius Media Firm, Inc. ("Radius"), began working with Marketel in June 2012. Roberts Decl. ¶ 8. Davis, through his company Odyssey Marketing, LLC ("Odyssey"), began working with Marketel in August 2012. Davis Decl. ¶¶ 4, 7. Both Roberts and Davis brought business to Marketel. Ortiz Dep. 257.

On August 23, 2012, Hassell resigned as CEO of AMAC. [D.E. 55-3] 15–16 (KJO 7–8). On September 12, 2012, Hassell and Ortiz signed an agreement in which Ortiz gave Hassell 1% of her Marketel shares, resulting in Hassell being a 51% owner of Marketel and Ortiz being a 49% owner. [D.E. 47-5] 15–16 (KJO 23–24).

In September 2012, Hassell, Ortiz, Roberts, Davis, and others met in Raleigh, North Carolina, to discuss Marketel's structure and future. Ortiz Dep. 152–54; Hassell Decl. ¶ 30; Roberts Decl. ¶ 21; Davis Decl. ¶ 9; Ortiz Decl. ¶ 18. At the meeting, Hassell suggested a "new profit split." Ortiz Decl. ¶ 18. The parties dispute whether Ortiz agreed to the new compensation model or a new business structure. Compare Ortiz Dep. 159–60, 173–74, 243–44, and Ortiz Decl. ¶¶ 19–22, with Hassell Decl. ¶ 30–32, and Roberts Decl. ¶ 22, and Davis Decl. ¶¶ 9–11, and Garner Decl. [D.E. 47-9] ¶ 7; see also [D.E. 47-5] 20–24 (MRK 713–17). Ortiz asserts that after these discussions she asked Hassell to pay her a salary. Ortiz Dep. 175–76.

Ortiz continued to "handle all invoicing and vendor payments" for Marketel during this period. Ortiz Dep. 135. Ortiz did not procure new clients for Marketel. Id. 133; Hassell Decl. ¶¶ 33, 37. Hassell, Roberts, and Davis allege that Ortiz began to make "regular and repeated mistakes" in her work. Hassell Decl. ¶ 36; Roberts Decl. ¶ 15; Davis Decl. ¶¶ 12–15. Ortiz denies that Roberts or Davis expressed any concern about her work to her. Ortiz Dep. 275. Ortiz acknowledges that

8

Hassell asked her to redo Marketel's profit distribution charts but argues that this resulted from Hassell "constantly giving new formulas and new spreadsheets" to Ortiz. Id. 252–54.

On November 6, 2012, Hassell eliminated Ortiz's access to Marketel's bank accounts. See [D.E. 47-5] 25–26 (MRK 534–35); [D.E. 55-8] 29 (MRK 549). Hassell claimed that he had done so "in light of the latest financial errors on the distribution spreadsheets [Ortiz had] been preparing." [D.E. 47-5] 25 (MRK 534). Hassell told Ortiz on the telephone that he was "severing [her] relationship with Marketel." Ortiz Dep. 274. Ortiz claims that this "came out of left field." Id. 275. Wells Fargo, Marketel's bank, placed a hold on Marketel's account after Ortiz attempted to regain access. [D.E. 47-5] 25 (MRK 534). Hassell asked Ortiz to write a letter to Wells Fargo stating that Hassell had the authority to block Ortiz's access. See id.

After Hassell ended Marketel's relationship with Ortiz, he discovered that Ashley Long, his personal assistant, had embezzled money using forged company checks and Marketel's debit card. Hassell Decl. ¶ 44; Long Dep. [D.E. 47-4] 35 (deposition pages 131–33).

Between October and December 2012, Ortiz and Long exchanged numerous texts. See [D.E. 55-3] 43–72 (KJO 392–421). In these texts, Long stated that Hassell sexually harassed her "all the time." Id. 50–52 (KJO 399–401); see also [D.E. 55-8] 6–7; Ortiz Dep. 87. Long now admits that many of her comments regarding Hassell's comments and behavior were false and explains that she "was trying to hurt [Hassell]" by sending the texts. Long Dep. [D.E. 47-4] 26–28 (deposition pages 97–102). Long also denies having a sexual affair with Hassell and that any sexual harassment occurred. Long Aff. [D.E. 62-2] ¶¶ 5–6; [D.E. 47-5] 27–29. Moreover, Long denies that Hassell paid for her rent or took her on dates, and she admits that she forged Hassell's name on multiple Marketel checks. See [D.E. 47-5] 27–29. Hassell acknowledged unilaterally giving Long some bonuses and "probably" giving her gifts. Hassell Dep. 168–69.

9

Ortiz alleges that after her separation from Marketel she learned for the first time about Intelimarc's work for WOF, other than the "Super Tuesday buy." Ortiz Dep. 150–51, 189–90, 195. Ortiz claims that she found copies of the 2012 emails discussing Intelimarc's work with and invoices to WOF "in Marketel's archived computer files." Ortiz Decl. ¶ 28.

On December 3, 2012, Hassell appointed himself director of Marketel, adopted articles of incorporation and bylaws, and passed other corporate resolutions. [D.E. 47-5] 69–73 (MRK 756–60). Hassell issued 51% of the shares to himself and 49% to Ortiz with an effective date of December 23, 2011. Id. 71–72 (MRK 757–58).

On February 14, 2013, Hassell sent Ortiz an email in which he offered to "accept [Ortiz's] shares on behalf of [Marketel]" in exchange for releasing Ortiz from "some definite financial liabilities in addition to some potential liabilities as yet undefined." [D.E. 55-8] 16 (MRK 619). Hassell gave Ortiz a deadline of February 15, 2013, to respond. Id. 17 (MRK 620). Hassell also noted a "separate issue revolv[ing] around Ashley Long," and he told Ortiz that he had "been struggling with whether or not to take the Ashley matter to the police. As I know you two were fairly close, I was hoping for your advice before making that final decision." Id. 16 (MRK 619). Ortiz interpreted this email as a threat that Hassell would file a police report that named her as an accomplice if she did not surrender her shares in Marketel. See Ortiz Decl. ¶ 32. Later that day, Hassell sent Ortiz another email in which he alleged that she had made slanderous and libelous remarks about him. [D.E. 55-8] 33 (MRK 618); see also Ortiz Dep. 281–82.

On April 22, 2013, Ortiz filed a complaint against Hassell and Marketel in the United States District Court for the Central District of California. Complaint, Ortiz v. Hassell, No. 5:13-cv-730-GHK (C.D. Cal. Apr. 22, 2013), [D.E. 1]. On May 15, 2013, Hassell and Marketel filed the instant action. [D.E. 1-1].

10

II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587.

It appears from the record, and the parties do not seem to dispute, that North Carolina substantive law governs defendants' claims. See, e.g., [D.E. 47-6] 14–16 (MRK 773–75) (North Carolina articles of incorporation for Marketel); [D.E. 55-7] 4–5 (KJO 4–5) (Marketel Ownership Agreement stating that "[t]he parties agree that this agreement shall be governed by North Carolina

11

law"); Movants' Mem. Supp. Summ. J. [D.E. 50] 25; Defs.' Mem. Opp'n Summ. J. [D.E. 55] 24.[2] In construing North Carolina law, the court must, absent "definitive authority from North Carolina's highest court, attempt to divine what that court would do were it faced with this [case]." Teague v. Bakker, 35 F.3d 978, 991 (4th Cir. 1994). In doing so, the court may consider cases from the North Carolina Court of Appeals, treatises, and the practices of other states. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005).

III.

A.

Defendants' first claim alleges a breach of fiduciary duty against Hassell for various actions that he took starting in September 2012. Defs.' Second Am. Compl. [D.E. 24] ¶¶ 18–24.[3] To prove a breach of fiduciary duty claim, a plaintiff must show that (1) the defendant owed the plaintiff a fiduciary duty of care; (2) the defendant violated that duty; and (3) the breach of duty proximately

---

[2] The parties never expressly state what they believe the governing law to be. Indeed, the lawyers on each side fail to cite much law whatsoever. For example, in their memorandum supporting their motion for summary judgment, movants cite two North Carolina cases, a smattering of cases from other states without explaining the relevance of those state-court decisions, and a few decisions from courts in this circuit. Nowhere do movants describe the legal elements of the claims on which they seek summary judgment. Defendants' brief is little better. They cite two North Carolina cases in their entire legal argument section. The parties' myopic focus on the presence or absence of genuine factual disputes ignores the core of Rule 56(a)'s test: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a) (emphasis added). It is impossible to know which facts are material without referencing the law that determines materiality. The court expects that both parties will properly refer to and analyze the appropriate law during the pendency of this proceeding (and in all future proceedings).

[3] To the extent defendants assert claims against "DOES 1–10" in claims one, two, three, four, five, six, seven, eight, and ten, defendants are formally on notice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure that all claims against "DOES 1–10" will be dismissed without further order of the court if defendants fail to serve "DOES 1–10" according to the Federal Rules before June 30, 2015. See Fed. R. Civ. P. 4(m). Because defendants have not raised any particularized allegations against "DOES 1–10," the court will not further discuss "DOES 1–10" in this order.

caused the plaintiff's injury. See Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001); HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991); Farndale Co. LLC v. Gibellini, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006). Controlling or majority shareholders owe a fiduciary duty to minority shareholders, including a duty to act in good faith. See, e.g., Gaines v. Long Mfg. Co., 234 N.C. 340, 344–45, 67 S.E.2d 350, 353–54 (1951); Farndale, 176 N.C. App. at 67, 628 S.E.2d at 19; Freese v. Smith, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993) ("As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation. However this rule is not without exception. In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders." (internal citation omitted)). "Once a minority shareholder challenges the actions of the majority, the burden shifts to the majority to establish the fairness and good faith of its actions." Freese, 110 N.C. App. at 37, 428 S.E.2d at 847. Furthermore, "[w]here fiduciary duties arising from management control are implicated, judicial scrutiny may extend to the purpose for which an otherwise lawful course was undertaken and the result achieved." Farndale, 176 N.C. App. at 68, 628 S.E.2d at 20 (quotation omitted).

Defendants allege four specific acts in which Hassell breached his fiduciary duty to Ortiz: (1) when Hassell imposed a new profit-sharing structure at Marketel in September 2012; (2) when Hassell blocked Ortiz's access to Marketel's bank accounts on November 6, 2012; (3) when Hassell reorganized Marketel's corporate structure in December 2012; and (4) when Hassell asked Ortiz to surrender her shares to Marketel in February 2013. Second Am. Compl. ¶¶ 19–22.

As for Hassell's alleged imposition of a new profit-sharing structure for Marketel and his actions in December 2012 in reorganizing Marketel's corporate structure, genuine issues of material

13

fact exists. Thus, the court denies Hassell's motion for summary judgment as to this part of claim one.

As for Hassell's blocking Ortiz's access to Marketel's bank accounts, this blocking relates to Ortiz's status as a Marketel employee and not her status as a minority shareholder. Thus, Hassell's actions do not implicate a fiduciary duty. See Dalton, 353 N.C. at 651, 548 S.E.2d at 708 ("However, the broad parameters accorded [to a fiduciary relationship] have been specifically limited in the context of employment situations. Under the general rule, the relation of employer and employee is not one of those regarded as confidential." (quotation omitted)). To the extent Ortiz argues that the bank lock-out caused any damages to Marketel, she cites no evidence that would rebut applying North Carolina's business judgment rule. See, e.g., Hammonds v. Lumbee River Elec. Membership Corp., 178 N.C. App. 1, 20–21, 631 S.E.2d 1, 13 (2006); State ex rel. Long v. ILA Corp., 132 N.C. App. 587, 602, 513 S.E.2d 812, 821–22 (1999). Thus, the court grants summary judgment on this part of claim one.

Assuming arguendo that Hassell's February 2013 actions in requesting that Ortiz relinquish her Marketel shares were a breach of a fiduciary duty, the record does not show that these actions proximately caused any injury to Ortiz. Thus, the court grants summary judgment on this part of claim one.

In sum, the court denies in part and grants in part Hassell's motion for summary judgment on claim one. Defendants may proceed with their claim to the extent that it involves Hassell's September 2012 imposition of an allegedly new profit-sharing structure and his actions in reorganizing Marketel's corporate structure, as described in paragraphs 19 and 21 of the Second Amended Complaint.

14

B.

Defendants' second claim alleges a breach of a fiduciary duty by Hassell and Intelimarc when Hassell diverted WOF business from Marketel to Intelimarc. Second Am. Compl. ¶¶ 25–27. As for defendants' argument that Intelimarc, a separate corporate entity, owed a fiduciary duty to Ortiz, a minority shareholder in Marketel, the argument fails. See Tin Originals, Inc. v. Colonial Tin Works, Inc., 98 N.C. App. 663, 665–66, 391 S.E.2d 831, 833 (1990) (rejecting a fiduciary relationship between "mutually interdependent businesses" where the defendant supplied 80% of the items that plaintiff sold).

As for defendants' claim against Hassell, under North Carolina law a corporate officer has a duty "to act with undivided loyalty" to the corporation. Meiselman v. Meiselman, 309 N.C. 279, 307, 307 S.E.2d 551, 568 (1983). Under this duty, "a corporate fiduciary may not appropriate to himself an opportunity that rightfully belongs to his corporation." Id. at 307, 307 S.E.2d at 568 (quotation omitted). "[W]hen an officer or director is charged with having usurped a corporate opportunity, he or she must establish . . . that the 'corporate transaction' in which he or she has engaged is 'just and reasonable' to the corporation because it was not an opportunity . . . which the corporation itself would have wanted." Id. at 310, 307 S.E.2d at 569. Furthermore:

In taking into account the fact that a corporate opportunity may arise not only in the same or direct line with a corporation's business, but also in a line complementary to it, we hold that in determining whether a corporate fiduciary has usurped a corporate opportunity—and thus that the "corporate transaction" in which he or she has entered is not "just and reasonable" to the corporation—a trial court is to approach the problem from two perspectives. It is to examine not only whether the disputed opportunity is functionally related to the corporation's business, but also whether the corporation has an interest or expectancy in the opportunity. In so doing, the trial court is to examine all of the facts in the particular case, including the "recurring circumstances" other courts have found relevant, in determining whether a corporate opportunity has indeed been usurped.

Id. at 311, 307 S.E.2d at 570 (emphasis added). There is a genuine issue of material fact concerning

15

whether Hassell breached his fiduciary duty to Marketel and to Ortiz by diverting WOF business to Intelimarc. See Hassell Dep. 101–06.

In opposition to this conclusion, Hassell cites Nebel v. Nebel, 241 N.C. 491, 85 S.E.2d 876 (1955), for the proposition that "shareholders cannot assert legal claims if they, with knowledge of the purported wrongful action by other shareholders or directors, have failed to voice concerns about the alleged wrongful actions." See Movants' Mem. Supp. Summ. J. 16. In Nebel, the Supreme Court of North Carolina noted that the plaintiffs were estopped from claiming some portion of corporate profits as dividends when those profits were invested in new capital "with their full knowledge and approval." Nebel, 241 N.C. at 503, 85 S.E.2d at 884–85.

Hassell contends that the record shows that, like the Nebel plaintiffs, Ortiz knew of and acquiesced to Intelimarc's independent working relationship with WOF and thus she is barred from bringing action against Hassell. See Movants' Mem. Supp. Summ. J. 16–18. This argument fails because, at both her deposition and in her declaration, Ortiz denied knowing of Intelimarc's independent working relationship with WOF until after Hassell terminated her employment with Marketel. See, e.g., Ortiz Dep. 150–51, 189–90, 195, 209; Ortiz Decl. ¶¶ 26–28. Hassell attempts to dismiss this sworn testimony as "self-serving," see Movants' Reply [D.E. 62] 2, but the court cannot resolve this material factual dispute at summary judgment.

As for Hassell's argument that WOF's expenditures to Intelimarc were available through public filings and media statements, the fact that Ortiz could have discovered Intelimarc's outside involvement with Marketel does not establish that she fully knew and approved of that involvement, which Hassell's argument requires. See Nebel, 241 N.C. at 503, 85 S.E.2d at 885.

Hassell also cites several cases from state courts of New York, Florida, and Delaware. See Movants' Mem. Supp. Summ. J. 19–20. Hassell fails to explain, however, how these decisions show

16

that there is no genuine issue of material fact and that he is entitled to summary judgment.

Finally, Hassell argues that Intelimarc's work for WOF was not an actual corporate opportunity for Marketel. Movants' Mem. Supp. Summ. J. 19. Hassell has not met his burden for summary judgment on this point. See Meiselman, 309 N.C. at 311, 307 S.E.2d at 570.

In sum, the court grants in part and denies in part movants' motion for summary judgment on claim two. Defendants may proceed with their claim of breach of fiduciary duty against Hassell for diversion of a corporate opportunity. Defendants may not proceed with this claim against Intelimarc.

C.

Defendants' third claim alleges that Hassell's alleged improper relationship with Long breached a fiduciary duty. Second Am. Compl. ¶¶ 28–30. Hassell responds that there is no evidence of an improper relationship with Long and no breach of fiduciary duty.

Although the evidence conflicts concerning whether Hassell had an improper relationship with Long, defendants fail to cite any case or explain how such a relationship constituted a breach of Hassell's fiduciary duty to Ortiz as a minority shareholder. Furthermore, assuming arguendo that the relationship was a breach of Hassell's fiduciary duty, no evidence suggests that this breach proximately caused any injury to Ortiz as a minority shareholder. See Farndale, 176 N.C. App. at 68, 628 S.E.2d at 20. Although Hassell admitted to "probably" giving Long some gifts, he did not state that he used Marketel funds for such gifts. Hassell Dep. 169. Moreover, no evidence suggests that Hassell gave Long bonuses for improper reasons. Id. 168–69. To the extent that Long allegedly forged Hassell's signature on Marketel checks for her own benefit, no evidence suggests that Long's access to checks was due to any improper relationship rather than to her role as Hassell's personal assistant. Thus, the court grants Hassell's motion for summary judgment on claim three.

17

Case 5:13-cv-00427-D   Document 65   Filed 05/19/15   Page 17 of 24

D.

Defendants' fourth claim alleges conversion by Hassell and Intelimarc with respect to the imposition of a new profit-sharing arrangement and the alleged diversion of WOF business to Intelimarc. Second Am. Compl. ¶¶ 31–34. Conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Peed v. Burleson's, Inc., 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (quotation omitted); see Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000). "[O]nly goods and personal property are properly the subjects of a claim for conversion." Norman, 140 N.C. App. at 414, 537 S.E.2d at 264.

Although movants fail to analyze the elements of this claim, summary judgment is appropriate. As for defendants' claim that movants converted money belonging to Ortiz through imposition of a profit-sharing arrangement or "formula," such a change was authorized because Hassell was the controlling Marketel shareholder at the time. Although this change arguably could be a breach of Hassell's fiduciary duty to Ortiz, the decision to change the allocation of profits was not an "unauthorized assumption" of Ortiz's personal property. Similarly, no evidence suggests that Ortiz or Marketel had a property right to the business, or profits derived therefrom, between Intelimarc and WOF. Thus, the court grants movants' motion for summary judgment on claim four.

E.

Defendants' fifth claim alleges a civil conspiracy among Hassell, Intelimarc, and numerous unidentified persons. Second Am. Compl. ¶¶ 35–37. In North Carolina, the elements of a civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." Strickland v. Hedrick, 194 N.C. App. 1, 19,

669 S.E.2d 61, 72 (2008) (quotation omitted); see also State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 444, 666 S.E.2d 107, 115 (2008); Privette v. Univ. of N.C. at Chapel Hill, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989). There must be an overt act in furtherance of the conspiracy. See Dove v. Harvey, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) ("In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts." (quotation omitted)). Civil conspiracy is premised on the underlying acts, and where a court grants summary judgment to a defendant on the underlying acts, the plaintiff's claim for civil conspiracy must also fail. Piraino Bros., LLC v. Atl. Fin. Grp., Inc., 211 N.C. App. 343, 350, 712 S.E.2d 328, 333–34 (2011). Morever, "[t]he doctrine of intracorporate immunity holds that, since at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself." State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 184 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007), aff'd in relevant part, 362 N.C. 431, 666 S.E.2d 107 (2008); Buschi v. Kirven, 775 F.2d 1240, 1251–54 (4th Cir. 1985); Iglesias v. Wolford, 539 F. Supp. 2d 831, 835–36 (E.D.N.C 2008)

Hassell was the sole owner and employee of Intelimarc. Hassell Dep. 104–05. As Intelimarc's sole owner and employee, Hassell could not conspire with Intelimarc. Cooper, 184 N.C. App. at 625, 646 S.E.2d at 799. There is also no evidence that Roberts or Davis, who started working with Marketel in 2012, formed an agreement with Hassell or Intelimarc "to perpetrate a fraud and deceit upon [Ortiz], and to breach the fiduciary duties owed to [Ortiz]." Second Am. Compl. ¶ 36. Rather, the evidence shows that Hassell invited Roberts and Davis to work with Marketel, and that at the September 2012 meeting in Raleigh, North Carolina, with Hassell, Ortiz, and others, Roberts and Davis agreed to Hassell's proposal for a new profit-sharing arrangement. Roberts Decl. ¶¶ 21–22; Davis Decl. ¶¶ 9–10. Defendants cite no evidence showing that Hassell

severed Marketel's relationship with Ortiz in furtherance of an agreement with others.[4] Although the parties dispute whether Roberts and Davis brought performance concerns to Ortiz's attention, this factual dispute is not material to the conspiracy claim. Simply put, Hassell and Intelimarc could not conspire as a matter of law, and there is no genuine dispute of material fact concerning whether Hassell conspired with others, including Roberts and Davis, to defraud Ortiz or breach his fiduciary duty to Ortiz. Thus, the court grants movants' motion for summary judgment on claim five.

F.

Defendants' sixth claim alleges constructive fraud by Hassell and Intelimarc. Second Am. Compl. ¶¶ 38–40. The elements of constructive fraud are "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." White v. Consol. Planning, Inc., 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004); see Forbis v. Neal, 361 N.C. 519, 528–29, 649 S.E.2d 382, 388–89 (2007); Self v. Yelton, 201 N.C. App. 653, 661, 688 S.E.2d 34, 39 (2010); Piles v. Allstate Ins. Co., 187 N.C. App. 399, 406, 653 S.E.2d 181, 186 (2007). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." White, 166 N.C. App. at 294, 603 S.E.2d at 156; Piles, 187 N.C. App. at 406, 653 S.E.2d at 186.

Intelimarc and Ortiz were not in a relationship of trust and confidence. Thus, this claim fails against Intelimarc. A genuine issue of material fact exists, however, concerning whether Hassell committed constructive fraud. See, e.g., [D.E. 47-5] 35, 38, 41, 43. Thus, the court grants in part and denies in part movants' motion for summary judgment on claim six. Defendants may proceed

---

[4] Defendants fail to make any argument as to what agreement they believe was formed.

20

with their claim of constructive fraud against Hassell. They may not proceed with this claim against Intelimarc.

G.

Defendants' seventh claim alleges a breach of implied duty of good faith and fair dealing by Hassell concerning the Marketel Ownership Agreement. Second Am. Compl. ¶¶ 41–45. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Williams v. Craft Dev., LLC, 199 N.C. App. 500, 506, 682 S.E.2d 719, 723 (2009) (quotation omitted); see also Bicycle Transit Auth. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985); Maglione v. Aegis Family Health Ctrs., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005). As discussed, genuine issues of material fact exist concerning whether Hassell breached his fiduciary duty, including a duty to act in good faith, owed to Ortiz, a minority shareholder in Marketel. Thus, summary judgment on this claim is inappropriate and the court denies Hassell's motion for summary judgment on claim seven. See Sunset Beach Dev., LLC v. AMEC, Inc., 196 N.C. App. 202, 217–18, 675 S.E.2d 46, 57 (2009).

H.

Defendants' eighth claim alleges fraud by concealment of Hassell's diversion of WOF business to Intelimarc by Hassell and Intelimarc. The essential elements of fraud by concealment are: "(1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; and (5) resulting in damage to the injured party." Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F. Supp. 2d 471, 476 (E.D.N.C. 2013); Forbis, 361 N.C. at 526–27, 649 S.E.2d at 387; Rowan Cnty Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992); Myers &

21

Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568–69, 374 S.E.2d 385, 391–92 (1988);

Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962).

> Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances . . . . [T]he silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exist which does not, and the uninformed party is deprived to the same extent that he would have been by positive assertion.

Setzer, 257 N.C. at 399, 126 S.E.2d at 137 (quotation omitted); Rahamankhan Tobacco Enters. Pvt.

Ltd., 989 F. Supp. 2d at 477 .

No evidence suggests that Hassell intended to deceive Ortiz by concealing Intelimarc's relationship with WOF. On December 7, 2011, at 12:19 p.m., Hassell sent Ortiz an email in which he stated that he was "meeting with Newt's people in a few minutes and will be tied up until at least 4:30 eastern. Maybe later." [D.E. 55-3] 31. Ortiz replied to the email that evening. Id. On December 14, 2011, one week later, Hassell sent Ortiz an email in which he noted a new client, "Winning Our Freedom," and the facts that Intelimarc was the "Agency Of Record" and Marketel was a "Buying Agenc[y] for Intelimarc, Inc." [D.E. 47-5] 9–10 (KJO 648–49). Although Ortiz notes that the name of the PAC was incorrect and claims that she never saw this email, or at least that "it would not have caught [her] eye," Ortiz Decl. ¶ 26, she does not dispute that Hassell sent the email to her. Although the parties dispute whether Hassell later told her about Intelimarc's relationship with WOF and whether Ortiz fully understood it, there is no dispute that Hassell sent her an email, on behalf of Intelimarc, shortly after signing, which noted an agreement with WOF and specifically stated that Intelimarc was the agency of record for "Winning Our Freedom" and that Marketel was a buying agency. Defendants cite no evidence suggesting that Hassell acted with intent to deceive when he allegedly withheld from Ortiz information on Intelimarc's relationship with

22

WOF. No genuine issue of material fact exists as to Hassell's intent to deceive, and movants are entitled to judgment as a matter of law on this claim. Thus, the court grants movants' motion for summary judgment on claim eight.

I.

Movants moved for summary judgment on all of defendants' claims against them, see Mot. Summ. J. [D.E. 47] 1, but Hassell made no specific argument as to claim ten. See generally Movants' Mem. Supp. Summ. J. 15–29.

In claim ten, defendants ask for an order requiring Hassell and Marketel to produce business records for inspection pursuant to N.C. Gen. Stat. §§ 55-16-02 and 55-16-03. Second Am. Compl. ¶¶ 54–60. Section 55-16-02 permits shareholders to inspect and copy specific business records. See, e.g., N.C. Gen. Stat. § 55-16-02(a), (b), (e). Ortiz has been and remains a qualified Marketel shareholder. N.C. Gen. Stat. § 55-16-02(g). Hassell has not met his burden to show that summary judgment is appropriate on this claim and Marketel has not moved for summary judgment. Thus, the court denies Hassell's motion for summary judgment on claim ten.

IV.

In sum, the court GRANTS IN PART and DENIES IN PART movants' motion for summary judgment [D.E. 47]. The court grants summary judgment to movants on defendants' claims three, four, five, and eight, and summary judgment with respect to Intelimarc on claims two and six. The court dismisses Intelimarc as a defendant. Defendants may proceed to trial on claims one (as limited), two, six, seven, nine, and ten. If defendants fail to serve "DOES 1–10" before June 30, 2015, the "DOES" shall be dismissed as defendants without further order of the court. The court also orders the parties to participate in court-hosted mediation with Magistrate Judge James E. Gates.

23

SO ORDERED. This __19__ day of May 2015.

_____

JAMES C. DEVER III
Chief United States District Judge

24